IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

ALLISON HOPPER-SANCHEZ

       Plaintiff,

v.                                       CIV 14-1042 JCH/KBM

CAROLYN W. COLVIN,
Acting Commissioner of Social Security,

       Defendant.

## PROPOSED FINDINGS AND RECOMMENDED DISPOSITION

Pursuant to 28 U.S.C. § 636(b), this matter has been referred to me for a recommended disposition. *Doc. 18.* Having carefully reviewed the parties' positions and the material portions of the record, the Court recommends that Plaintiff's motion to remand be denied.

### I.      PROCEDURAL HISTORY

Plaintiff, Allison Hopper-Sanchez, filed an initial application with the Social Security Administration for Disability Insurance and Supplemental Security Income benefits on July 25, 2011. *AR* at 174.[1] Plaintiff's claims were initially denied on November 28, 2011, *id.* at 71-105, and upon reconsideration on April 17, 2010. *Id.* at 116-122. Administrative Law Judge Michelle K. Lindsay ("the ALJ") held a *de novo* hearing on February 7, 2013, at which a vocational expert Crystal Younger testified and attorney A. Wayne Walterscheid represented Plaintiff. *Id.* at 28-70. The ALJ issued her decision that Plaintiff was not disabled on June 24, 2013. *Id.* at 6-22. The Appeals Council denied Plaintiff's request for review of the ALJ's decision on September 9,

---

[1]  Document 13 and all attachments thereto comprise the sealed Administrative Record ("AR"). The Court cites the Record's internal pagination, rather than the CM/ECF document and page numbers.

2014. *Id.* at 1-5. As such, the ALJ's Decision became the final decision of the Commissioner. *Doyal v. Barnhart*, 331 F.3d 758, 459 (10th Cir. 2003).

At the time she applied for disability benefits in July 2011, Plaintiff was thirty-six years old. *AR* at 174.[2] Plaintiff stated in her application that her ability to work was limited by the following conditions: back injury; depression; anxiety; bipolar disorder; torn rotator cuff; attention deficit hyperactivity disorder ("ADHD"); liver disease; social disorder; personality disorder; and irritable bowel syndrome. *Id.* at 222. Plaintiff stated that she became unable to work because of these conditions on September 21, 2010. *Id.* at 218.

Prior to claiming disability Plaintiff worked as an overnight stocker at Wal-Mart, a cook and cashier at McDonald's, a clerk at an Allsup's convenience store, a clerk at the Village of Rio Del Sol convention center, a cashier at Bealls, a file clerk in an attorney's office, a housekeeper at the Inn of the Mountain Gods, did various temporary work through an agency, was a line cook and counter manager at Captain D's, and was an assembly line worker at Diversity Decorative Plastics making automotive emblems. *Id.* at 39-45, 240. Of note is that some of Plaintiff's work, as reported by her, actually occurred during her stated period of disability. *Id.* at 18, 39-40, 240. Plaintiff's work at Wal-Mart occurred in January of 2012 and her work at McDonald's from July-September, 2011. *Id.* Plaintiff worked at these jobs for periods of approximately five weeks and four weeks, respectively. *Id.* According to Plaintiff, she was fired from Wal-Mart for excessive call-ins because she was "sick throwing up" and from McDonald's because of personality conflicts. *Id.* at 40.

---

[2] Plaintiff previously applied for benefits in 2007 and was denied upon her initial application. *AR* at 218.

A claimant seeking disability benefits must establish that she is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A); 20 C.F.R. § 404.1505(a). In evaluating a claimant's eligibility for benefits the ALJ is required to use a five-step sequential evaluation process. 20 C.F.R. §§ 404.1520(a)(4) and 416.920(a)(4).

At Step One of the sequential evaluation process, the ALJ found that Plaintiff met the insured status requirements of the Social Security Act through December 31, 2014, and had not engaged in substantial gainful activity since September 21, 2010. *AR* at 11. At Step Two, the ALJ found evidence that Plaintiff suffers from the following severe impairments: gastroesophageal reflux disease ("GERD"); right rotator cuff partial thickness tear with impingement of the shoulder; bipolar disorder; posttraumatic stress disorder ("PTSD"); personality disorder; NOS, with cluster B traits including narcissistic, borderline and histrionic; and ADHD. *Id.* at 11. At Step Three, the ALJ concluded that Plaintiff's impairments did not meet or medically equal the regulatory "listings." *Id.* at 12. The ALJ also determined that Plaintiff has the residual functional capacity ("RFC") to perform light work as defined in 20 C.F.R 404.1567(b) and 416.967(b). *Id.* at 14. Specifically, the ALJ found that Plaintiff can sit or walk/stand six hours in an eight hour work day, is able to maintain attention and concentration for periods of two hours, and can perform repetitive skilled and semi-skilled tasks – so long as she is not required to interact regularly with her coworkers or the general public. *Id.* In other words, while the ALJ found that Plaintiff was impaired to some degree, she ultimately concluded that

3

Plaintiff is "not as limited as she claims." *Id.* at 15-20. Consequently, at Steps Four and Five the ALJ determined that Plaintiff is capable of performing her past relevant work as a housekeeper and a file clerk and other jobs within the bounds of her RFC and is, therefore, not disabled. *Id.* at 21

The ALJ's determination that Plaintiff is not disabled rested, at least in part, upon her finding that Plaintiff's statements as to the "intensity, persistence and limiting effects" of the symptoms of her impairments were not entirely credible. *See id.* at 16, 18, 20. Specifically, the ALJ found that Plaintiff's GERD improved with medication, and that Plaintiff's social activities, including frequenting a friend's tattoo shop, detracted from Plaintiff's assertions that her GERD symptoms are disabling. *Id.* at 20.  The ALJ also found that Plaintiff's decision to undergo breast augmentation during the period of alleged disability undercut her assertions of disabling symptoms. *AR* at 20. Relatedly, the ALJ mentioned in passing Plaintiff's failure to identify this surgery when questioned about it at the hearing but later supplemented the record with an affidavit. *See id.* at 15; *see also id.* at 61-62. It is these credibility findings, and these findings alone, with which Plaintiff takes issue. *See generally Doc. 23* at 17-25.

## II.   <u>STANDARD OF REVIEW</u>

The general inquiry is whether the ALJ applied the correct legal standards and whether her decision is supported by substantial evidence. *Keyes-Zachary v. Astrue*, 695 F.3d 1156, 1161 (10th Cir. 2012). A deficiency in either area is grounds for remand. *Id.*

"Credibility determinations are peculiarly the province of the finder of fact and [the Court] will not upset such determinations when supported by substantial evidence."

*Hackett v. Barnhart*, 395 F.3d 1168, 1173 (10th Cir. 2005) (quoting *Kepler v. Chater*, 68 F.3d 387, 391 (10th Cir. 1995). Substantial evidence is more than a "mere scintilla." *Richardson v. Perales*, 402 U.S. 389, 401 (1971). "It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Id.* However, evidence is not substantial if it is overwhelmed by other evidence or is actually a mere conclusion. *Slocum v. Sec'y of Health & Human Services*, 9 F.3d 117 (10th Cir. 1993).

It is the prerogative of the ALJ to resolve evidentiary conflicts so long as her finding is supported by substantial evidence. *Keyes-Zachary*, 695 F.3d at 1172. The Court is not permitted to reweigh evidence, second guess, or substitute its judgment for that of the ALJ. *Wall v. Astrue*, 561 F.3d 1048, 1070 (10th Cir. 2009); *Raymond v. Astrue*, 621 F.3d 1269, 1273 (10th Cir. 2009). Rather, this Court looks only to whether the ALJ's credibility findings are "closely and affirmatively linked" to record evidence. *Wall*, 561 F.3d at 1070. This inquiry is conducted "via a meticulous examination of the record as a whole[,]" *id.* at 1067, which includes examining "anything that may undercut or detract from the ALJ's findings[.]" *Flaherty v. Astrue*, 515 F.3d 1067, 1070 (10th Cir. 2007).

"The ALJ is not required to discuss every piece of evidence… [o]n the contrary, [the Tenth Circuit] will generally find the ALJ's decision adequate if it discusses the 'uncontroverted evidence' the ALJ chooses not to rely upon and any 'significantly probative evidence' the ALJ decides to reject." *Wall*, 561 F.3d at 1067.  Moreover, if the ALJ indicates that she has considered all evidence in the record, then the Court generally must take her at her word. *Id.* at 1070.

With these standards in mind, the Court finds that the ALJ's credibility findings in this matter are supported by substantial record evidence.

### III.   ANALYSIS

Plaintiff takes no real issue with any particular step in the ALJ's analysis, but focuses her argument on the ALJ's credibility determinations while formulating her residual functional capacity ("RFC"). *See generally Doc. 22*. Plaintiff specifically asserts that the ALJ's credibility findings are flawed because they fail to fairly take into account the record as a whole. *Doc. 23* at 18. Plaintiff makes three arguments in this regard.

First, Plaintiff argues that the most recent medical records show that the ALJ erred in finding that Plaintiff's GERD has improved with medication. *Doc. 23* at 18; *Doc. 32* at 2-3. Next, Plaintiff asserts that the ALJ exaggerated the evidence of Plaintiff's daily and social activities because she "only sometimes performed these activities but was usually too ill to do them." *Doc. 23* at 19-22. Finally, Plaintiff argues that the ALJ did not "adequately consider [her] reasons for not obtaining greater medical treatment." *Id.* at 22-24. The Court will address each of these arguments in turn.

### A. THE ALJ'S FINDING THAT PLAINTIFF'S GERD SYMPTOMS IMPROVED WITH MEDICATION IS SUPPORTED BY THE RECORD.

Plaintiff first argues that the ALJ erred in finding that her subjective complaints regarding her "intractable nausea and vomiting" were not "entirely credible" because Plaintiff's physician, Arlene Brown, M.D., "certified the medical necessity of enrolling [Plaintiff] for (sic) the New Mexico medical cannabis program" on May 23, 2013. *Compare Doc. 23* at 18, 25 *with AR* at 16, 20. Plaintiff asserts the ALJ failed to consider the complete record given that she did not mention this certification in her decision denying benefits. *Doc. 23* at 18; *Doc. 32* at 2. More specifically, Plaintiff argues that the

ALJ makes an unsupported conclusion by stating that Plaintiff's medical records show that her condition has improved. *Doc.* 23 at 18.

As this record was available to the ALJ when she rendered her decision on June 24, 2013, her failure to at least mention it is facially suspect. However, after careful review of the record, the Court finds that the ALJ committed no reversible error by this omission for three reasons.

First, Plaintiff misunderstands the ALJ's finding. The ALJ does not unqualifiedly state that Plaintiff's GERD has improved. The ALJ states that "[t]he most recent medical records reflect that [Plaintiff's] gastroesophageal reflux disease has improved *with medications.*" *AR* at 20 (emphasis added). This distinction is important. The ALJ did not find that Plaintiff's symptomology had recently improved, only that it showed improvement with medication. Ironically, Plaintiff's argument hinges upon a record that certifies her need to use medical marijuana. The ALJ's finding was, accordingly, not contrary to this record; it was in conformance with it. Plaintiff sought a medical marijuana license for treating the symptoms of her GERD and her psychiatric disorders. Plaintiff's reliance on her medical marijuana certification shows that she believes, as did the ALJ, that her symptoms can improve with medication, albeit one that is currently prohibited by federal law.

Second, the ALJ stated that she considered all of Plaintiff's "symptoms and the extent to which these symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence[.]" *AR* at 14. As stated above, where, as here, the ALJ indicates she has considered all the evidence, the Court generally takes her at her word. *Wall*, 561 F.3d at 1070. As further described below, in this case the

ALJ's discussion of the evidence and the reasons for her conclusions demonstrate that she adequately considered the record as a whole. To wit, the ALJ cites many instances of Plaintiff's treatment by Dr. Brown and other providers, spanning from November, 2008, through January, 2013. *AR* at 16-20. The ALJ clearly considered Dr. Brown's longitudinal records regarding Plaintiff's GERD and its associated symptoms, even if she did not explicitly reference the certification. *Id.*

Third, upon the Court's review of the record, the May 23, 2013 medical marijuana certification does not indicate a substantive change in Plaintiff's condition or past self-medication. *See* AR at 892 (Plaintiff "uses cannabis to stabilize weight and mood"). Thus, even if the court takes as a given that the ALJ's decision omits the certification to use medical marijuana, *compare Doc. 23* at 18 *with AR* at 9-22, any such error is harmless. *See Keyes-Zachary*, 695 F.3d at 1168-9.

Plaintiff has a long history of gastroesophageal problems but admits, as she must, that her medical records from December 12, 2012, show improvement in her symptoms insofar as she was able to eat without vomiting and had significantly less pain. *Doc. 23* at 18; *see AR* at 798. Prior to this visit, Plaintiff had undergone an EGD, during which a polyp was removed. *AR* at 806; 831-2. When she followed-up with Dr. Brown on December 12, 2012, Plaintiff's symptoms were successfully combated by Carafate,[3] Protonix,[4] and Zantac.[5] *Id.* at 798. Plaintiff also reported at this visit that she had started back on her bipolar medications and she believed that her nausea and

---

[3] Used to treat ulcers by adhering to the stomach lining so as to protect them from acids, enzymes, and bile salts. <http://www.drugs.com/search.php?searchterm=Carafate>.

[4] Used to treat "conditions involving excess stomach acid." <http://www.drugs.com/protonix.html>.

[5] Used to treat conditions in which the stomach produces too much acid, such as GERD. <http://www.drugs.com/zantac.html>.

vomiting had improved as a result. *Id.* Plaintiff was released with findings that she was positive for nausea and abdominal pain but negative for, among other things, vomiting. *Id.* at 799. Plaintiff was advised to continue her medications as prescribed and to follow-up with Dr. Brown in two weeks. *Id.* at 800. It was also noted that Plaintiff was using marijuana. *Id.* at 798.

Plaintiff followed-up with Dr. Brown's office on January 21, 2013. *Id.* at 806. At this visit Plaintiff "state[d] that since the EGD (removal of polyp) she has not had any further vomiting episodes" and is "[a]ble to tolerate a regular diet better than before." *Id.* At this time Plaintiff continued to use Protonix, Carafate, and Zantac to control her GERD-related symptoms. *Id.* at 807. It was noted that Plaintiff was "doing well in relation to her vomiting/acid reflux." *Id.* at 808. Plaintiff was advised to follow up in four to six weeks to discuss her medications, was counseled about the potential side effects of her medication, and was advised to notify Dr. Brown's office of any problems with her medication. *Id.* at 809. It is again noted that Plaintiff was using marijuana. *Id.* at 807.

No other medical records were submitted by Plaintiff prior to her hearing, which occurred on February 7, 2013. *Id.* at 28. At her hearing Plaintiff testified that she has been "sick throwing up... for the last three years on a daily basis. Some days [she is] good. Some days [she is] not." *Id.* at 40. Because of her constant vomiting, Plaintiff stated that she does not eat on a regular basis, and that she does not eat three meals per day, but only when she can eat. *Id.* at 46. Plaintiff did say that she had eaten on the day of the hearing and that she had eaten the previous evening, but that it might be three or four days before she could eat again. *Id.* According to Plaintiff, these meals were the only food she had eaten since the previous Friday (the hearing occurred on a

Thursday), other than "a cracker here and there." *Id.* at 47. Plaintiff further testified that even after a good day where she could eat, after about twelve hours she would feel sick again once her stomach was empty. *Id.* at 56. Plaintiff explained that she is unable to eat regularly because her then-current medications - Protonix, Carafate, Phenergan,[6] Zofran[7] and Zantac - have no effect on her symptoms. *AR* at 49. However, Plaintiff reported that marijuana helps alleviate her symptoms so that she is able to eat, although she did not have a license to use it for medicinal purposes under New Mexico law. *Id.* at 55.

Later, on June 14, 2013, Plaintiff supplemented the administrative record with a medical record from Dr. Brown's office documenting a visit on May 23, 2013. *Id.* at 888. As a result of that visit Dr. Brown certified Plaintiff to apply to the New Mexico Department of Health's medicinal cannabis program. *Id.* at 893. Plaintiff reported at that time that marijuana, combined with some of her other medications, was the only effective means to control "both her nausea and her moods." *Id.* Dr. Brown indicated that a prescription to use medical marijuana may be warranted in Plaintiff's case because she "continues to cycle frequently, from intractable vomiting and depression to manic." *Id.* Dr. Brown notes upon review of Plaintiff's symptoms that she suffers from "gastrointestinal anorexia nausea without medication[,]" and advised Plaintiff to attempt to obtain "patient assistance and restart medications." *Id.*

While the ALJ does not reference the May 23, 2013 appointment, she discusses all of Plaintiff's medical records in late 2012 and early 2013. *See id.* at 20. Based upon

---

[6] Used to treat allergy symptoms, nausea and vomiting and also used as a sleep aid. <http://www.drugs.com/phenergan.html>.

[7] Used to prevent nausea and vomiting. <http://www.drugs.com/zofran.html>.

these records, the ALJ found that Plaintiff's GERD-related symptoms improved with medication. This finding is closely and affirmatively linked with the record evidence, and the subsequent record from May 2013 does not contradict this finding.

The Court does not discount Plaintiff's symptomology as noted by Dr. Brown; however, as to whether the May 23, 2013 record indicates a substantive change in Plaintiff's condition, Dr. Brown's use of the word "continues" is telling. It is evident from the ALJ's discussion that the severity of Plaintiff's symptoms has cycled throughout her treatment. The ALJ's finding recognizes this by concluding only that Plaintiff's medical records indicate improvement in her symptoms with medication. The May 23, 2013 record merely affirms this fact, and presents another example of Plaintiff's attempts to find chemical relief for her symptoms. As the Commissioner correctly notes, the May 2013 authorization appears to have "simply formalized Plaintiff's longstanding practice of using marijuana to alleviate her symptoms." *Doc. 27* at 10.

Regardless, it was the ALJ's prerogative to weigh this evidence as a whole and come to a conclusion as to the disabling effects of Plaintiff's symptoms. Given her detailed discussion of the record, the ALJ's findings are closely and affirmatively linked to substantial evidence in the record; and, to the extent that the ALJ erred in not referencing Plaintiff's May 23, 2013 certification to use medical marijuana, any such error is harmless.

## B. THE ALJ'S CREDIBILITY FINDINGS AS TO PLAINTIFF'S DAILY ACTIVITIES ARE SUPPORTED BY THE RECORD.

Plaintiff argues that the ALJ improperly "exaggerated the evidence of [her] daily and social activities." *Doc. 23* at 19. Plaintiff asserts that "the ALJ failed to perform a detailed and realistic assessment" of these activities because she misrepresented

11

Plaintiff's actual activities as stated by Plaintiff in her function reports. *Doc. 23* at 19-21.[8]

The upshot of Plaintiff's argument is that the ALJ's findings were unfair because she

only sometimes performed the activities stated in her function reports "but was usually

too ill to do them." *Id.* at 20. Upon review of the record, the Court is not persuaded.

In her first function report, submitted on September 13, 2011, Plaintiff outlines the

extent to which her daily activities are limited as follows:

> Sometimes gets up around 7:00 or 8:00. Other times at 10:00 or 11:00.
> Runs errands. Pays bills. Goes to doctor appointments. Stays at home
> most of the time. Will do light laundry. Will start cleaning but pain prevents
> her from completing the task. Watches TV at night. Goes to bed around
> 10:00 but sometimes cannot get to sleep until 2:00 or 3:00 in the morning.

*Id.* at 232. Plaintiff clarifies in the report that she only does laundry "when she feels up

to it" and that she only occasionally vacuums and sweeps if she can rest periodically. *Id.*

at 234. Plaintiff sometimes needs a friend's help to complete her housework. *Id.* Plaintiff

also states that she "[f]eeds her cats and dogs" but "cannot walk them because of

broken back and broken knee[,]" and her friends help her "carry large food bags and will

help with walking and bathing dogs." *Id.* at 233. Plaintiff also reports that she is no

longer able to do yard work because of her pain. *Id.* at 235.

As to her daily hygiene, Plaintiff reports that "[t]here are days she does not feel

like getting dressed. Sometimes due to pain and legs has trouble putting clothes on[;]"

that she "[n]eeds help taking a shower[;]" [n]eeds help if she wants [her] hair to look

nice, otherwise wears it on top of her head[;]" does not shave very often; has to hold

onto something when getting up from the toilet[;] and "[h]as trouble bending over to tie

shoes or to cut toenails." *Id.* at 233. Plaintiff further states that she needs reminders to

_____

[8] Ironically, Plaintiff discounts the ALJ's citations to her function reports because they were submitted "nearly two years prior to the hearing," but then goes on to rely on the same reports. *Doc. 23* at 19-21.

change her clothes, take a shower, and to take her medication and that she does not handle changes in her routine well. *Id.* at 234, 238.

In that report, Plaintiff states that when feels like eating, she is able to prepare "[s]andwiches, chilli (sic), [and] macaroni and cheese." *Id.* However, Plaintiff reports that "[d]id more cooking before her disability, when she was married and had medication to control the pain." *Id.* Plaintiff says that while she does go out "[o]nce in a while[,]" she prefers to stay at home or have people over to her house because she "[d]oes not like to be around too many people" and she "[t]ends to get irritated with people." *Id.* at 235-7. Plaintiff also states that she is "very outspoken and has alienated some family members and friends." *Id.* at 237. Plaintiff reports that while she gets along well with authority figures, she sometimes has trouble with her bosses and was fired from numerous jobs because she could not get along with others. *Id.* at 238.

Plaintiff states that when she does go out she cannot go out alone because she has "severe abandonment issues[,] [f]eels like someone is always watching her[,]" and "sometimes has panic attacks." *Id.* at 235. However, Plaintiff later indicates that she does not need someone to accompany her when she goes out. *Id.* at 235. Plaintiff lists her hobbies and interests as photography, tattoos and piercings. *Id.* at 236. Plaintiff states that she "loves to get tattoos and piercings" and would like to become a professional photographer if she had the money, even though "[s]he cannot stand for long periods to do photography like she would like to do." *Id.*

Plaintiff further indicates in her report that she needs someone else to handle her money because she is not good at math, but that "[i]f someone else gives her the money to pay a bill she can get the money order to pay it." *Id.* at 235. Plaintiff had, at

13

the time, a savings account but had trouble maintaining a balance in it. *Id.*[9] However, Plaintiff indicates that her ability to handle money has not changed since the onset of her symptoms. *Id.* at 236.

Plaintiff's mother later submitted a function report on Plaintiff's behalf on September 23, 2011. *AR* at 248-255. While the ALJ did not assign it much weight "because of its high degree of subjectivity," *id.* at 16, the report was considered "in terms of helping to understand the severity of [Plaintiff's] various symptoms over time." *Id.*

Plaintiff's mother generally states that Plaintiff watches TV, goes out to eat, and shops with others three times per week. *Id.* at 252. Specifically, Plaintiff's mother states that she and Plaintiff interact two or three times per week, *id.* at 248; that Plaintiff cares for two dogs without assistance, *id.* at 249; that Plaintiff goes out four to five times per week and does so alone, *id.* at 251; and she shops for clothes and jewelry once or twice a month. *Id.* Plaintiff's mother also reports that Plaintiff is careless and impulsive with her money and her ability to manage her money has decreased with time. *Id.* at 251-2.

Plaintiff submitted a subsequent function report on October 24, 2011. *AR* at 265-272. In her second report, Plaintiff makes the following statements. She gets up at eleven or twelve o'clock, takes medications, eats and goes back to bed. *Id.* at 265-6. She spends 85% of her time at home in bed and, if she runs errands, she comes home and goes back to bed. *Id.* She is able to feed, water and let her dogs outside. *Id.* at 266. She reports that she now sleeps three to six hours a night. *Id.* She "sometimes" bathes but typically does not want to get out of bed to change clothes, *id.*, and that her friends

---

[9] This statement conflicts with Plaintiff's application for benefits, dated August 19, 2011, wherein she stated that she has no bank account. *AR* at 166.

sometimes tell her she smells. *Id.* at 267. She needs reminders to take medicine and writes notes in appointment book to remember. *Id.* She only eats enough to take her medication - when she has medication, that is. *Id.* at 266. When she eats, she prepares meals one to two times per day and only eats sandwiches and microwavable foods; whereas she used to cook three-course meals. *Id.* at 267. She now only does light loads of laundry and cleans only about once a month. *Id.* at 267. She now does not go out alone because of her self-esteem issues, *id.* at 268, and only goes to grocery store once a month. *Id.* Plaintiff says that she was never taught how to budget money or use a checkbook, *id.* at 268, and that her ability to manage money was no different before her onset date. *Id.* at 269. As for hobbies, she no longer practices photography because she cannot afford it but maintains the hobbies of music and drawing. *Id.* at 269. In sum, Plaintiff states that she does not "do anything anymore" and does not "go anywhere" or "socialize like [she] used to." *Id.* at 269-270.

On December 21, 2012 Plaintiff visited Dr. Brown's office complaining of a swollen left knee. *AR* at 837. Plaintiff told Dr. Brown that she injured her knee by tripping over a bag of clothes while carrying laundry. *Id.*

At the hearing on February 7, 2013 the ALJ asked Plaintiff to describe her average day. Plaintiff testified that she has more bad days than good days and that she spends ninety-eight percent of her time in bed. *AR* at 55-6. On bad days, she said that she vomits, does not get out of bed or get dressed, and watches TV. *Id.* However, Plaintiff indicated that on a good day she can eat and do chores such as dishes and laundry. *Id.* at 56.

15

Plaintiff also testified that when she occasionally hangs out with friends she will either have them come to her house, she will go to theirs, or they will go to the store. *Id.* Plaintiff also stated that she spends time in a tattoo shop owned by a good friend, where she gets free tattoos. *Id.* at 57, 60. Generally, Plaintiff represented that she spends the majority of her time either at home, in bed, or the tattoo shop. *Id.*

Turning to Plaintiff's assertions of error, she faults the ALJ's credibility findings by reference to a particular statement:

> The claimant's allegations regarding the degree and extent of her mental and physical symptoms are not entirely credible… [Plaintiff] had been performing laundry chores recently, carrying a basket, and in her function report the claimant alleged that she ran errands, paid bills, washed clothes, fed her dogs and cats, could take care of her personal care but with some difficulty, could fix meals, swept, drove, shopped with friends, and socialized with others… As for her mental impairments, the claimant has continued to socialize with others, including spending time at a tattoo shop engaging others, and she has continued to function as reflected above without taking medications.

*See Doc. 23* at 20 (citing *AR* at 20).  This statement arguably supports Plaintiff's position because it does not account for the limitations she stated in her function reports. However, this was not the only mention of Plaintiff's daily activities by the ALJ; rather, earlier in her opinion the ALJ states that:

> [t]he claimant stated that she experienced good days and bad days. She claimed she experienced more bad days than good days, and during these times she spent the day in bed, in her pajamas, doing nothing but watching television and throwing up. On good days, she stated she could eat, and take her Tramadol. However, she alleged she still did very little activity. Generally, she claimed that she would occasionally visit with friends and spend time at a tattoo shop.
> …
> In her function report, the claimant alleged that she ran errands, paid bills, washed clothes, fed her dogs and cats, could take care of her personal care but with some difficulty, could fix meals, swept, drove, shopped with friends, had difficulty managing money, liked tattoos and piercings, and socialized with others. However, she alleged that her impairments limited

16

> her to lifting thirty-five to forty pounds, and negatively affected her ability to
> squat, bend, stand, reach, walk, sit, kneel, talk, hear, climb stairs,
> remember, complete tasks, concentrate, understand, and follow
> instructions.

*AR* at 15-6. This presentation of Plaintiff's symptoms by the ALJ alone belies her

assignment of error because the majority of her concerns are in fact contained within

the ALJ's opinion, just not the text she focuses on. *See Doc. 23* at 19-22. In other

words, the ALJ actually considered Plaintiff's asserted limitations on her daily activities

when determining whether her symptoms, as stated, were credible. *See, e.g.*, *Howard*

*v. Barnhart,* 379 F.3d 945, 948 (10th Cir 2004) (discarding claimant's assertion of error

that the ALJ failed to consider her obesity where it was discussed elsewhere in the

ALJ's opinion).

      More importantly, taken as a whole, the ALJ's credibility findings as to Plaintiff's

daily activities are supported by substantial evidence – most by Plaintiff's own

statements. The ALJ cited and considered Plaintiff's two function reports, the function

report filled out by her mother, a medical record from December 21, 2012, documenting

her treatment for a knee injury after tripping over a bag of clothes while carrying laundry,

and her testimony at the hearing. *AR* at 16 (citing Exhibit 6E (*AR* at 248-55)), 20 (citing

Exhibits 20F, 4E and 10E (*AR* 232-9, 265-72, 836-8)). The ALJ also discusses Plaintiff's

act of continuing to work after her alleged onset date through January 8, 2012. *AR* at

18. Plaintiff's brief relies only upon her function reports. *Doc. 23* at 20-21. While

reasonable minds might disagree with some of the ALJ's characterizations of Plaintiff's

daily activities, that is not the standard. The ALJ's finding, and the evidence upon which

it was premised, is not overwhelmed by any evidence Plaintiff cites.

Finally, Plaintiff argues that the ALJ's finding that she regularly "socializ[es]" or "engag[es] others" at a tattoo shop is not supported by the record. *Doc. 23* at 21. This finding, however, is also supported by substantial evidence. During her testimony Plaintiff stated that she spends 98% of her time in bed. *AR* at 56. Plaintiff testified soon after that she spends the majority of her time at home or at her friend's tattoo shop, where she gets free tattoos. *Id.* at 57, 60. Even if Plaintiff only spends 2% of her time at her friend's tattoo shop, such activity is certainly more "regular" than any other Plaintiff engages in. Plaintiff describes herself as "covered" in tattoos and piercings, and she even got tattooed less than two weeks before her hearing. *Id.* at 50. While there may not be an explicit statement in the record concerning Plaintiff's activities at the tattoo shop, it is common sense that Plaintiff would have to engage and socialize with at least one other person (her tattoo artist friend) while procuring any of her numerous tattoos and piercings. In sum, the Court is confident that the ALJ's credibility findings as to Plaintiff's daily activities are closely and affirmatively tied to substantial record evidence.

## C. THE ALJ'S CREDIBILITY FINDINGS AS TO PLAINTIFF'S FAILURE TO PURSUE ADDITIONAL MEDICAL TREATMENT ARE SUPPORTED BY THE RECORD.

Finally, Plaintiff argues that the ALJ did not adequately consider her reasons for not seeking greater medical treatment. *Doc. 23* at 22. Plaintiff's first argument is straightforward; she asserts that the ALJ failed to consider "other-than-financial reasons for [her] inability to get treatment" for her psychological disorders because she was unable to take psychiatric medication due to her liver damage and nausea and vomiting. *Id.* at 23. Plaintiff's second argument is confusing. Initially, Plaintiff does not appear to challenge the ALJ's findings as to her inability to afford treatment. *Id.* However, she later

references her decision to obtain breast augmentation surgery a month prior to her onset date as evidence of her inability to manage money and, by extension, her ability to "rationally plan[] her medical care in the long term[,]" pointing out that she "only became financially unable to afford treatment… for at least a year after the August 2010 surgery." *Id.* at 22-4. Thus, Plaintiff's argument appears to be that the ALJ improperly found that she would have additional resources to pay for her treatment but for her breast augmentation surgery - which itself was a manifestation of her psychiatric disorders. Assuming this is an accurate statement of Plaintiff's positions, the Court is not persuaded.

Plaintiff's argument concerning her inability to take medications due to her liver disease[10] and nausea and vomiting misunderstands the ALJ's finding. The ALJ took as a given that Plaintiff could not take her psychiatric medications but found, nonetheless, that Plaintiff "has continued to socialize with others, including spending time at a tattoo shop engaging others, and she has continued to function as reflected above without taking medications." *AR* at 20. This finding has nothing to do with Plaintiff's ability or inability to take her medications. Instead, the finding is directed at the degree to which Plaintiff's symptoms are disabling. In other words, the ALJ found that Plaintiff's symptoms are not disabling *despite* Plaintiff's reasons for not taking medication. This finding is closely and affirmatively linked to substantial evidence - Plaintiff's own statements and testimony. In support of her finding the ALJ pointed to evidence

---

[10] The parties disagree as to whether Plaintiff's concerns about her liver are legitimate. Defendant points out that there is no objective finding in Plaintiff's medical records as to liver toxicity, and essentially argues that it was Plaintiff's choice to discontinue medications. *Doc. 27* at 13. Plaintiff counters Defendant's position is an example of post-hoc reasoning and that even if she was mistaken as to an actual diagnosis of liver disease, her fear was reasonable and should have been considered by the ALJ nonetheless. *Doc. 32* at 3-6. As articulated in this decision, none of this matters because the ALJ made no finding that Plaintiff failed to mitigate her symptoms by discontinuing her medications. Rather, the ALJ found that even without medications Plaintiff's psychiatric-related symptoms are not disabling. *AR* at 20.

contained in Plaintiff's function reports and Plaintiff's testimony at the hearing where Plaintiff admits to spending time with friends or at a friend's tattoo shop. *See id.* at 57, 236.

Plaintiff's argument that her psychiatric disorders cause her lack of self-esteem and inability to manage money, which is evidenced by her impulsive and "poor" use of money on her breast augmentation surgery, *see Doc. 23* at 23-4, also misses the mark for two reasons. First, the ALJ discussed Plaintiff's ability to recite most of her surgeries at the hearing but omission of the breast augmentation surgery in its entirety until she submitted her affidavit after the hearing. *AR* at 15. While Plaintiff's affidavit states that she did not mention her breast augmentation surgery at the hearing because she did not think it was relevant to her disability claims, *id.* at 15, 886, to the extent that the ALJ gauged Plaintiff's credibility based upon her failure to report her breast augmentation surgery at the hearing, the same is within her discretion.

Second, Plaintiff misunderstands the ALJ's finding as to her breast augmentation surgery. The ALJ's finding was directed, not at Plaintiff's ability to afford treatment, but at Plaintiff's credibility in alleging disabling symptoms. *Id.* at 20 ("While it is within the claimant's right and within her discretion to use this money in the manner she chooses, it does present a credibility issues (sic) *regarding the claimant's allegations of disability* in that she chose not to use her money to improve her physical and mental health from impairments she has since described as disabling.") (emphasis added). In other words, the ALJ did not find that Plaintiff should have forgone breast augmentation so as to be able to afford treatment, but, rather, that Plaintiff's decision to obtain breast augmentation discredits her allegations of disabling impairments generally. *Id.* The ALJ

20

linked this finding to record evidence by discussing Plaintiff's pre-onset symptoms, which include those associated with her GERD, *see id.* at 16, in association with Plaintiff's decision to undergo breast augmentation surgery on August 24, 2010, less than one month prior to her alleged onset date – September 21, 2010. *See id.* at 9, 20, 232, 865.

Plaintiff counters that her affidavit and a letter provided for her by Dr. Brown establish that her bipolar disorder is the reason she obtained breast augmentation and was subsequently unable to afford treatment. *See Doc. 23* at 23-4; *AR* at 558, 886. Again, the ALJ's finding was not directed at Plaintiff's inability to afford treatment, but at the severity of her claimed symptomology at the time she applied for benefits. *AR* at 20.

## IV.   CONCLUSION

For these reasons, the Court concludes that the ALJ committed no reversible error in her analysis of Plaintiff's claims and that her findings should be affirmed.

**IT IS HEREBY RECOMMENDED** that Plaintiff's motion to reverse or remand *(Doc. 22)* be denied.

---

**THE PARTIES ARE FURTHER NOTIFIED THAT WITHIN 14 DAYS OF SERVICE** of a copy of these Proposed Findings and Recommended Disposition, they may file written objections with the Clerk of the District Court pursuant to 28 U.S.C. § 636(b)(1).
**A party must file any objections with the Clerk of the District Court within the fourteen-day period if that party wants to have appellate review of the proposed findings and recommended disposition.  If no objections are filed, no appellate review will be allowed.**

---

_____
UNITED STATES CHIEF MAGISTRATE JUDGE